(No. 71994.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DOROTHY WILLIAMS, Appellant.

*Opinion filed September 22, 1994.—Rehearing denied January 30, 1995.*

2

4

Rita A. Fry, Public Defender, of Chicago (Robert P. Isaacson, Assistant Public Defender, of counsel, and S. Catherine Cha, law student), for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Ter-

ence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Celeste Stewart Stack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

In the circuit court of Cook County a jury convicted the defendant, Dorothy Williams, of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1)) and robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—1(a)). Following a hearing the circuit court denied her post-trial motion for a new trial or, in the alternative, a judgment *non obstante veredicto.* Defendant having waived a jury for sentencing, the cause was submitted for hearing on sentencing to the court, which found the defendant eligible for the imposition of the death penalty, pursuant to section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)), for the reason that she had committed murder in the course of another felony, namely, robbery. Following the consideration of aggravating and mitigating factors (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c)), the court found that there were no mitigating factors sufficient to preclude the imposition of the death sentence and, accordingly, sentenced her to death. The cause comes directly to this court for review (Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603), where defendant presents 19 issues for consideration.

Initially defendant contends that she was arrested without probable cause in violation of her fourth amendment rights and, as a result, her statement, together with other products of the illegal arrest, must be suppressed. The victim, 97-year-old Mary Harris, who resided in housing for senior citizens operated by the Chicago Housing Authority, was strangled on July 25, 1989, in her apartment, from which a stereo set was found to be missing. At the hearing on the defendant's

pretrial motion to quash her arrest and to suppress statements that she claimed to be the direct product of her unlawful arrest, the following evidence was adduced.

Officer Betty Woods testified that she was assigned to the division of the police department providing services to senior citizens and was familiar with the circumstances of Harris' death. On September 6, 1989, she was using an unmarked squad car and working alone in plain clothes at the building in which Harris' body had been discovered. While the officer was in the building, a man who she later learned was Hubert Carmichael approached her at approximately 11 or 11:30 a.m. He indicated that he had observed a woman carrying a box and leaving the building on the date of Harris' murder, that he had suspected that the woman might have been involved in this murder, and that he had seen the woman in the building again on September 5, 1989. He indicated further to Officer Woods that the woman, whom he had known as "Peggy," had altered her appearance since the date of the homicide by shortening her hair and dyeing it red. Although this woman had frequented the building prior to the death of Harris, she had stopped coming there since that time. To the best of the officer's knowledge, the woman described had no friends or relatives in the building and no lawful reason to be in it. The officer was aware that the person Carmichael had seen leaving the building around the time of the murder of Harris had also been identified by him as the same person whom he had previously seen choke another resident of the building. The officer was aware as well that the suspect in the strangulation of still another elderly person, residing in a neighboring building for senior citizens, fit the description of the woman whom Carmichael had seen leaving on the evening of Harris' murder. Later, as Officer Woods was departing from the building at about noon, Carmichael pointed to

a woman walking by the building outside the window and indicated that this was the same woman about whom he had spoken earlier.

Officer Woods then approached the woman, identified herself as a police officer, showed the woman her badge, and asked if she could speak with her. The woman was the defendant, 35 years old at the time, who identified herself as "Deborah" Williams and was accompanied by another woman, Michelle McBride. At first Officer Woods attempted to have detectives who were familiar with the case come out to interview the defendant, but the detectives were unavailable at that time. Officer Woods then informed defendant and her companion that it might be faster and easier if they went to the place where the detectives are generally stationed. Both women agreed to do so. When defendant's companion expressed concern about picking up her child from school, Officer Woods told her that the police would accommodate her. McBride had wanted to be sure that either she would be back in time to pick up her child or her child would be picked up by someone else. The officer offered the two women transportation in her car and drove them, without handcuffs, to the police station, which was located a distance of less than two miles, or about 16 to 18 blocks, from the building where the offense occurred. The drive took about 8 to 10 minutes. Although Officer Woods was armed, her weapon was not visible, and the officer did not draw it at any time. Officer Woods had no warrant for defendant's arrest. Nor did she tell defendant or her companion that they did not have to accompany her to the station. However, neither woman objected to doing so.

At the station Officer Woods left the two women in the middle of the large office on the second floor and went a distance of about 40 feet to a desk to inform the officer on duty that she had a woman with her who had

been implicated in a homicide. After the desk sergeant looked up the case, Officer Woods told the two women, who were standing and waiting in the middle of the room, that it would be only a few moments until they found out which detective was handling the case. Once Officer Woods located and spoke to the detective assigned to investigate the murder of Mary Harris, she left the police station and had no further involvement in the matter.

The other witness who testified at this hearing was a police detective, Edward Schmitt, who stated that on July 27, 1989, during the course of the investigation into the death of Harris, he had spoken with Carmichael. During his investigation he had learned that a number of items were found to have been missing from the apartment of Harris following her death, including a Realistic Clarinet Number 16 stereo, two speakers, a bedspread, and a cardboard box. On the afternoon of September 6, 1989, he and his partner spoke with Officer Woods and then with the defendant, who was with McBride in a large interview room measuring approximately 10 by 20 feet on the second floor of the police station. The door to the room was open. The officers asked McBride to "step out" of the room. Their conversation with defendant began at about 1:15 or 1:30 and lasted approximately 10 or 15 minutes. At the beginning of the conversation he and his partner advised defendant of her *Miranda* rights. When they asked her when she had last been in the building in which Harris had lived, she responded that it had been several years since she had been there. At the end of the conversation the detective and his partner left the interview room, leaving the door open. McBride, who had been asked to leave the interview room while the police spoke with defendant, was walking around in the police station when the officers left the interview room and "might have

even been sitting in there with Miss Williams when we left." Defendant was not handcuffed when they left the interview room.

Thereafter he and his partner spoke with Carmichael, who advised them that he had seen the defendant there the day before, on September 5, having changed her appearance by dyeing her hair a reddish color. At approximately 2 p.m. the detective asked defendant to sign a form consenting to the search of her apartment; she did so using the name "Deborah" Williams. From defendant's apartment the detective and his partner recovered a Realistic Clarinet Number 16 stereo and two speakers. Shortly after 3:00 that afternoon he and his partner conversed with defendant again, this time for about five minutes, in the same interview room in which they had spoken earlier, the door of which was open. Defendant was not handcuffed upon their return. At that time Detective Schmitt showed defendant the stereo. Defendant responded that it was hers, that she had bought it "hot," that is, as stolen property, on the street about a month earlier from a black man whom she did not know. At that time she agreed to take a polygraph examination and to be fingerprinted. During both conversations the defendant appeared to be cool, calm, and unconcerned, answering all questions freely.

Thereafter the defendant was fingerprinted and, at about 6:30 p.m. that same day, transported to another location where she took and failed a polygraph examination. Later, at about 8:30 p.m., police formally arrested her for the murder of Harris.

At the hearing on the motion to suppress, the trial court expressly found that at the moment defendant responded that the material discovered in her apartment was "hot" and that she had so purchased it, probable cause existed to take her into custody. In denying the

defendant's motion, the circuit court observed, *inter alia,* that Officer Woods "is a very slightly built woman *** five feet tall at best and a hundred pounds at best." The court described the defendant as "five-foot-five to five-foot-seven in height and *** accompanied by another woman." The circuit court concluded that "during the period of time that the Defendant was in the station I have no evidence of any objective facts from which I believe I can rationally conclude she was in custody until the time the officer says she was formally arrested."

Defendant asserts that the circuit court's finding that she was not under arrest when Officer Woods took her to the police station is against the manifest weight of the evidence and, accordingly, must be reversed. She argues further that she "was under arrest when she was taken to the police station and interrogated by different detectives over a twenty-four hour period. Dorothy did not choose to spend two days and a night in the police station. The trial judge's ruling to the contrary was manifestly erroneous and should be reversed."

The constitutions of both the United States and the State of Illinois protect individuals from unreasonable searches and seizures. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.) For purposes of the fourth amendment, a seizure is synonymous with an arrest, and an arrest effected without probable cause or a warrant based thereon violates the protections of the amendment. (*People v. Melock* (1992), 149 Ill. 2d 423, 436.) An arrest occurs when a person's freedom of movement has been restrained by means of physical force or by a show of authority. (*Melock,* 149 Ill. 2d at 436.) To determine whether an arrest has, indeed, occurred, the question to ask is whether a reasonable, innocent person would, under the circumstances, have considered herself arrested or free to leave. (*People v. Reynolds* (1983), 94

Ill. 2d 160, 165.) A reviewing court will not disturb the determination of a circuit court on a motion to suppress evidence unless the determination is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *Reynolds*, 94 Ill. 2d at 165.) On such a motion the defendant bears the burden of proof that the search and seizure were unlawful. *People v. Hoskins* (1984), 101 Ill. 2d 209, 212.

The undisputed evidence here does not support defendant's contention that she was under arrest when Officer Woods took her to the police station. As we have said, the officer attempted initially to have detectives familiar with the case come out to interview the defendant, but when she learned they were unable to do so, she advised the defendant and her companion that it might be faster and easier if they went to the police station. The women agreed, accepting the transportation offered by Officer Woods, who was driving an unmarked car. Although the officer was armed, her weapon was not visible and was at no time drawn. The officer, a slight woman several inches shorter than the defendant, was alone in her dealings with the two women. The officer, who was wearing plain clothes, addressed the concerns of the defendant's companion concerning her child's dismissal from school, advising her that she would be back in time to pick the child up herself or that someone would pick the child up for her. The drive to the station was not long. At no time was the defendant handcuffed. After transporting the defendant and her companion to the police station, Officer Woods departed, leaving the two unattended in the middle of a large room. Although the officer did not tell defendant that she did not have to accompany her to the station, nothing about these circumstances would lead a reasonable, innocent person to consider herself arrested or to conclude that she was not free to leave. The evidence of

record reveals that the defendant accompanied Officer Woods to the police station voluntarily.

The defendant declares in her brief that after she arrived at the police station she was detained unlawfully for approximately 24 hours or longer. However, once she stated at about 3 p.m. on September 6, 1989, that she had purchased the stereo set resembling the one missing from Harris' apartment in the knowledge that it was stolen, police had probable cause to arrest her. Thus, after making that statement she could not have been detained unlawfully.

Moreover, the conduct of the two detectives who interviewed defendant at the police station prior to her making of this statement would not cause a reasonable, innocent person to conclude that she was either under arrest or deprived of her freedom. What this court said in *People v. Wipfler* (1977), 68 Ill. 2d 158, 168, of station-house interrogations applies equally to the detectives' initial questioning of the defendant here:

> "To hold that this amounted to an arrest would be to hold that virtually any station-house interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police."

Although the officers did advise the instant defendant of her *Miranda* rights at the beginning of their conversation with her, a custodial situation cannot be created merely by the giving of *Miranda* warnings (*Wipfler*, 68 Ill. 2d at 171). Having given these warnings, the detectives spoke with defendant but briefly, she was not handcuffed, and the door to the large room in which they interviewed her was open. Further, her companion was permitted to remain in the same room with her before, and possibly after, the detectives' initial conver-

sation with her. As the circuit court pointed out, "apparently, at all times critical her companion was in the police station with her." In addition, from the time defendant arrived at the police station until she stated that she had bought the stereo set as stolen property, none of the procedures, such as booking and fingerprinting, that are normally associated with arrest were performed. (See *Melock*, 149 Ill. 2d at 438.) The evidence adduced at the motion to suppress does not tend to show that a reasonable, innocent person would have felt that she was not free to leave during the time that elapsed between defendant's arrival at the police station and her statement concerning the purchase of the stereo set at about 3 p.m. Plainly, the circuit court's determination that defendant was not arrested at the time in question is not manifestly erroneous. Thus, the circuit court properly denied her motion to suppress.

As the second issue defendant presents for review, she maintains that she was denied a fair hearing on her pretrial motion to suppress evidence, in part because the circuit court prevented her from eliciting from Officer Woods an answer to the question whether defendant was free to leave once she arrived at the police station. Defendant argues that this and other rulings of the circuit court during the hearing rendered it a "sham." Although the subjective intent of a police officer to detain a suspect is relevant, such intent is not controlling. (See *Reynolds*, 94 Ill. 2d at 165.) The record contains no indication that the circuit court restricted defendant's examination of Officer Woods concerning the officer's speech or any other conduct by which the officer might have manifested a belief that the defendant was not free to leave. In short, this record contains no evidence whatsoever that, if Officer Woods did entertain such a belief, it was communicated to the defendant in any way, either directly or indirectly. In view

of the abundant evidence in the record supporting the circuit court's denial of defendant's motion to suppress, any error on the part of the court in sustaining the State's objection to this question could not have affected the outcome of the hearing on the motion and, as a consequence, amounted to no more than harmless error. Likewise, even if we assume that the circuit court erred with respect to the other rulings about which defendant complains, in light of the evidence adduced at this hearing, these errors could have been but harmless.

As the third and fourth issues defendant advances on appeal, she contends that she was denied a fair trial during *voir dire* for two reasons: (1) the circuit court failed to exercise sound discretion when it improperly excused for cause prospective juror Esther Smith, and (2) the State exercised a peremptory challenge against prospective juror Alvin Pettigrew in a systematic exclusion by the State of African-Americans from the jury.

With respect to Esther Smith, the State asked that she be excused for cause for her failure to acknowledge "that she's currently under supervision for a marijuana case" and for having "perjured herself." Earlier the circuit court had addressed to a panel of four that included Smith the following question: "Other than what you may have already told me, have you ever been a party to or otherwise particularly interested in the outcome of a criminal case? If you have please indicate by raising your hand." The court's observation follows immediately in the record: "I see no hands raised." Thereafter the State asked this question of the same panel of four: "Now the four of you, has anyone you know, a neighbor, friend or had [*sic*] anyone else been arrested, convicted, put on probation, tried or sent to jail. If they have could you raise your hand, please." The State then recognized Smith, who stated in re-

sponse: "Just hearing about different people in the neighborhood or something. No one personally but I have heard of people going to jail." When the State asked, "Anyone close to you?" Smith responded in the negative. The State asserted that Smith had responded in the negative in writing to a similar question on a card she had filled out: "She was asked if she's ever been accused or arrested and those are the only—knows any person who was accused, arrested. Same age, same middle initial. Here's the description and she checked the card no." Countering the State's request that Smith be excused for cause, the defendant asked that she be questioned again and asked specifically about the marijuana case, adding that "[p]eople make mistakes when they check the card and I think it would only be fair to ask." After further discussion the circuit court concluded, "I think that there were enough questions that were asked of her. I'm going to excuse her for cause." Defendant maintains that "[t]he only fair way to clear up any confusion would have been to ask Esther Smith a few simple questions, as the defense requested."

The purpose of *voir dire* is to assure the selection of an impartial panel of jurors free from either bias or prejudice. (*People v. Bowel* (1986), 111 Ill. 2d 58, 64.) Pursuant to Supreme Court Rule 234 (134 Ill. 2d R. 234), made applicable to criminal cases by Rule 431 (134 Ill. 2d R. 431), the primary responsibility for both initiating and conducting the *voir dire* examination lies with the circuit court, and the manner and scope of that examination rests within the discretion of that court. (*People v. Porter* (1986), 111 Ill. 2d 386, 401; see *Kingston v. Turner* (1987), 115 Ill. 2d 445, 464.) An abuse of the court's discretion will be found only if, after a review of the record, it is determined that the conduct of the court thwarted the selection of an impartial jury. (*Kingston,* 115 Ill. 2d at 465.) Our review of this record in no way

suggests that the conduct of the court impeded the selection of an impartial jury. The veracity of those who testify during *voir dire* is a matter lying solely within the sound discretion of the circuit court, and the decision to excuse a potential juror because of a reasonable belief that that person has been untruthful under oath is a question best left with that court. *People v. Smith* (1992), 152 Ill. 2d 229, 272.

With regard to Alvin Pettigrew, after the State exercised a peremptory challenge against him, the defendant moved pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, to require the State to "justify why they're knocking the only black member of the venire off." The circuit court expressed the belief that the defendant had made a *prima facie* case "in light of the fact that there are no black people on the jury." In response the State pointed out that "the first juror that they knocked off was a black person so if they had an all-white jury now this is not because of actions on our part, so I'm just stating, Judge, that number one I'm just taking exception and I will then explain for Your Honor." Thereafter the following colloquy occurred between the circuit court and counsel for the State and for the defendant:

"MS. LEVIN [Assistant State's Attorney]: I don't believe that they've made a prima facie case by making one challenge of one black person. The other people we've challenged have been white. They have challenged a black person themselves.

THE COURT: That's true, but I believe they have—

MS. LEVIN: Judge, the reason why we're knocking him off, number one, is the first time that he kept his hat on the whole time and and—He kept his hat on the whole time he was in the courtroom until Your Honor—

THE COURT: It's my fault.

MS. LEVIN: The deputy sheriffs in this courtroom has [*sic*] a practice of telling everybody to take their hats off and we, number one, say that that shows disrespect of the

court system. Number two, when you asked him he was not answering questions with full sentences. You asked him how long have you worked at your job. He said 29. You had to pull from the teeth 29 years.

He does not know where his own children are working or what they are doing. All the people we accepted did. We don't feel this is a person who would pay attention to the—with respect to the court or that he in fact pays attention to his own children, so we think there is a lack of attention that will be paid to this case and this is why we are in fact knocking him off, and we are taking exception to even giving you our reasons.

MR. McNERNEY [Assistant State's Attorney]: I'd like to—If I may, I would like you to consider the fact we have already passed other people that they excused. I just want the Court to consider that.

THE COURT: I will consider that.

MS. PANTLE [defense counsel]: Judge, his answers have been very responsive. They've been prompt. They've been responsive to Your Honor's questions. You didn't have to pull anything out of him. There was another woman that wasn't sure where her—I believe it was where her daughter worked, that the State accepted. Mr. Pettigrew was going bald. He might have some sensitivity to that fact and that's why he kept his hat on and—

MS. LEVIN: We don't know that.

MS. PANTLE: We don't know that the sheriffs told him to take their hats [sic] off either, Judge.

MS. LEVIN: There's a sign on the court room door, Judge.

THE COURT: I'm taking into consideration the following factors—

MS. LEVIN: Judge, the victim is also black in this case.

THE COURT: I'm taking into consideration the following factors. This is the first challenge State has made of a person who is black—defense made a challenge of a person who was black. Why there hasn't been anymore black people on the venire I don't understand. I've never seen venire with less black people. He did have his hat on and his answers were short, somewhat cryptic. And I will also point out that from what I know the case [sic] the alleged victim is black as well.

I'm going to find that—I'm going to find that the State did make their case and I will accept their [peremptory] challenge."

The exclusion of just one minority venireperson because of race is unconstitutional and requires reversal of a defendant's conviction. (*People v. Harris* (1989), 129 Ill. 2d 123, 175.) In *Batson* the court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violative of the equal protection clause: (1) the defendant must make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race; (2) if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the prospective jurors in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. (*Hernandez v. New York* (1991), 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1865-66.) We turn directly to the question whether the circuit court erred in finding that the State articulated legitimate, race-neutral reasons for exercising its peremptory challenge to exclude the African-American venireperson Alvin Pettigrew.

A factual finding by the circuit court at a *Batson* hearing is entitled to great deference on review and will be set aside only if it is clearly erroneous. (*People v. Hope* (1992), 147 Ill. 2d 315, 321.) Because an explanation that focuses on a venireperson's body language or demeanor lends itself to pretext, such an explanation must be scrutinized closely. (*Harris*, 129 Ill. 2d at 176.) However, the demeanor of a prospective juror has been traditionally an important factor in jury selection, and a prospective juror's demeanor constitutes a legitimate, racially neutral reason for exercising a peremptory challenge. (*People v. Young* (1989), 128 Ill. 2d 1, 20.) The circuit court has both the opportunity to observe a

juror's demeanor upon *voir dire* and the experience in supervising such examinations to assess the explanations of the State concerning the exercise of a peremptory challenge. *Young*, 128 Ill. 2d at 21.

In the instant case the circuit court found it significant that Pettigrew failed to remove his hat during the proceeding in the courtroom until requested to do so by the court and that Pettigrew gave "short, somewhat cryptic" answers. The defendant argues that two non-African-American jurors who were accepted by the State answered questions in a "substantially similar" manner. However, the record indicates that, whereas the meaning of any abbreviated answers of either of these two jurors was readily apparent, the meaning of some of Pettigrew's was not and, to be ascertained, required further questioning by the court. After observing the demeanor of prospective juror Pettigrew and evaluating his responses to questions, the circuit court determined that the State's concern was legitimate. We cannot say that the court's assessment in this regard was erroneous.

In finding that the State had given legitimate, race-neutral reasons for exercising a peremptory challenge against Pettigrew, the circuit court did not mention as a factor a third reason advanced by the State: Pettigrew's lack of knowledge concerning the employment of one of his four children, a 24-year-old son who, he said, "[w]orks downtown somewhere." Although the defendant contends that a non-African-American juror accepted by the State was similarly uninformed about the employment of her 23-year-old daughter, the record shows that this juror provided considerable information about the nature of her daughter's work. Although the juror was "not positive" about her daughter's occupation, she explained that "[s]he works for a moving company. She deals with the insurance for the furniture that's being moved and that and the insurance for the

drivers." Thus, the record reveals that the responses of the two are decidedly dissimilar. Like the first two reasons set forth by the State for the exercise of a peremptory challenge against Pettigrew, this third and final reason appears to be a legitimate, race-neutral one. The record makes plain that the finding of the circuit court is not clearly erroneous. Accordingly, we may not disturb it.

At trial the evidence of guilt marshaled by the State against the defendant was overwhelming. Not the least of it was defendant's statement made to police on September 7, 1989, before a court reporter that defendant had strangled Harris and had taken a "component set" from the victim's apartment. In the statement, which was read to the jury, defendant said that on July 25, 1989, she had gone into Harris' apartment and had talked with Harris for about 10 minutes, at which time Harris asked her to go to the store for her and gave her $2 for that purpose. As she gave defendant the money, Harris turned around, and defendant "grabbed her from the back," putting her arms around Harris' stomach and "trying to stop her from talking." Defendant did so, she stated, because she wanted to "[g]et the component set" to sell for drugs. Harris was telling defendant in a loud voice to let her go, and when Harris began to scratch defendant, defendant "grabbed" a "rag" Harris wore around her head and tried to put it over Harris' mouth "[s]o she wouldn't scream." As defendant put the rag over Harris' mouth and around her neck, Harris was "pulling it trying to get it off" and attempting to get away from defendant. Defendant described the rag as having been around Harris' neck for "[a]bout a half a minute or a minute." When Harris fainted and began to fall, defendant "threw her on the bed." As Harris started to fall, she was saying, "[O]h"; when defendant threw her on the bed, she had stopped speaking. After

throwing Harris down, defendant said, she "grabbed the component set and *** left out."

Among other evidence introduced by the State was the testimony of Marian Harris, the victim's daughter, that when she had visited her mother on the morning of her death, Mary Harris was wearing a pink scarf on her head. Marian Harris testified further that following her mother's death a small Realistic Clarinet 16 stereo set she had purchased for her mother was missing. On the morning of September 7, 1989, she identified a stereo set at the police station as the one she had purchased for her mother. Following her mother's death the witness discovered missing one of three large boxes that had been in her mother's apartment on the morning of her death and a lightweight sheer print bedspread.

Hubert Carmichael, a resident of the same apartment building as the victim, testified that at about 6:30 p.m. on July 25, 1989, as he was standing at the window of the day room on the first floor, he saw a woman whom he identified as the defendant leaving the building alone and carrying a box large enough to hold the stereo set found to be missing from the victim's apartment. The woman, whom Carmichael had seen on numerous prior occasions, was dressed in what appeared to him to be a white nurse's uniform. When he saw her again on September 6, 1989, defendant's hair color had been changed to red, and she was wearing glasses. Another resident of the building, Willie Shelby, testified that she had left the victim's apartment at about 6 p.m. on the evening of her death.

A detective who had been called to the scene of the homicide following its discovery at about 8 p.m. testified that the dresser drawers of the victim's apartment were found to be open and in disarray, as was her closet. Her body was lying on the bed, a "bandanna" around her neck knotted in front. Entry appeared not to have been

forced. Detective Schmidt testified concerning the recovery of a "Realistic clarinet number sixteen stereo system with two speakers" from the defendant's apartment on the afternoon of September 6, 1989. He recounted defendant's statement that it was her property and that she had bought it "hot," as stolen merchandise, on the street about a month earlier from a black male whom she did not know and was unable to describe. Expert testimony established that the defendant's fingerprints were found on objects that were inside the apartment of Harris after her death. The medical examiner described the victim's body as having a ligature around the neck, namely, a pink "kerchief" knotted at the angle of the jaw and wrapped tightly around the neck. The victim's hyoid bone had been fractured, an indication that "really extreme pressure" had been applied to the neck. In his opinion the cause of death of the victim, who was approximately 5 feet 3 inches tall and weighed 99 pounds fully clad, was ligature strangulation. Both of the victim's eyes were black and blue, a result, in his opinion, of having been struck.

The defendant did not testify.

For our review the defendant presents five minor evidentiary issues related to that part of her trial in which guilt was determined. We have read the entire record on appeal and have determined that these issues are not meritorious. The State urges that many of them are waived for review by virtue of the defendant's failure properly to preserve them for appeal. However, should these issues not be deemed waived for review, the overwhelming evidence adduced at trial against the defendant renders any of these errors—if error they be—harmless beyond a reasonable doubt, incapable of having deprived her of a fair trial, as she argues before this court.

Defendant raises four issues in which she asserts prosecutorial excess and other error related to closing argument that served to deny her a fair trial and the right to present a defense. Likewise, our examination of the record reveals that these issues are without merit. Again, the State maintains that defendant has waived for review a number of these claims of error. If prosecutorial comment exceeds the bounds of proper argument, the verdict must not be disturbed unless it can be said that the remark caused substantial prejudice to the defendant. (*People v. Johnson* (1992), 149 Ill. 2d 118, 145.) Here, even if those errors claimed to have been waived should not be deemed so, in light of the overwhelming evidence of defendant's guilt, any of the errors asserted to have occurred during closing argument could have constituted nothing more than error harmless beyond a reasonable doubt.

During the first phase of the sentencing proceeding, in which the State sought to establish the defendant's eligibility for the death penalty, the circuit court concluded that the killing of Harris was motivated by robbery and for the purpose of completing a robbery and, therefore, found defendant eligible for imposition of the death penalty. During the second phase of the sentencing proceeding, the State introduced statements by the defendant in which she admitted having strangled Lonnie Laws with his belt on December 5, 1987, and to having stabbed Caesar Zuell during the first weeks of December 1988. Defendant has been charged with first degree murder in their deaths. In part by stipulation the State introduced considerable evidence concerning the circumstances of the deaths of these two slight, elderly men, including information obtained upon autopsy, which was consistent with the details given by defendant in her court-reported statements to police about their deaths.

The State introduced as well evidence that the defendant had robbed four other elderly persons in their apartments, which were located in the same building in which Harris had lived and in similar housing nearby: Frederick Adamson on July 4, 1989; Clyde Simmons on July 1, 1989; Martha Foster on April 4, 1989; and Jasper Irving on both April 4, 1989, and January 11, 1986. A police officer with whom Adamson had spoken concerning the robbery of July 4, 1989, testified that Adamson had stated that this was the third time that the defendant had robbed him. The defendant's fingerprints or palmprints were found within the apartments of Caesar Zuell and Martha Foster following the commission of the offenses alleged to have been committed therein and on the exterior door of the apartment of Lonnie Laws. The evidence indicated that in order to gain entrance to the apartments of many of these elderly persons, as well as the apartments of still others, defendant used various ruses, including the pretense that the resident knew or was related to her and the deception that defendant had come to aid the resident. The evidence indicated that defendant was often physically abusive of these elderly persons whom she robbed. Another witness, Emma Lipsey, described an episode in October of 1973 in which defendant hit her in the mouth with a wooden milk crate about 18 inches square, knocking out two of her lower teeth as a result. On May 30, 1973, defendant kicked a police officer 10 to 12 times in the face and chest after he arrested her for creating a disturbance by the use of loud, profane, and vulgar language in a crowd of about 50 that had gathered in response to a street fight between two other persons. On March 10, 1975, defendant was convicted of the offenses of delivery and possession of marijuana and sentenced to 18 months of misdemeanor probation and fined $200. On November 23, 1989, while the defendant was incarcerated awaiting

trial, she was verbally abusive and verbally threatening to a correctional officer.

In mitigation defendant introduced evidence that during her incarceration prior to trial she was charged with no disciplinary violation other than the one arising out of her behavior on November 23, 1989. Defendant's mother testified that she had separated from defendant's father shortly before defendant's birth and that defendant's contact with her father, who had died four years prior to the hearing, had been limited essentially to "writing." Defendant's older sister, to whom defendant had been close, had died of bronchial pneumonia in January of 1987. Defendant has two children, a daughter aged 22 at the time of the hearing in April of 1991 and a son aged 20. Defendant became pregnant with her daughter when she was 15 years old. The father of that child was killed in 1978. The father of defendant's son appears to have provided no support for his child. Defendant's daughter testified that she had been raised by her mother, who had treated her and her brother very well.

Defendant presents six other issues for our review, all of which are related to sentencing. Of these we turn first to her contention that the death penalty is not the appropriate punishment for her and that, instead, she should be sentenced to natural life in prison without parole. When reviewing a sentence of death, this court will make a separate evaluation of the record, but it will not overturn the findings of the circuit court when, as here, they are amply supported by the evidence. (*People v. Ward* (1992), 154 Ill. 2d 272, 340; *People v. Odle* (1988), 128 Ill. 2d 111, 136.) We agree with the trial court's apt and accurate observation that "the matters in aggravation so far exceed the matters in mitigation as to reduce the matters in mitigation to insignificance." In light of both the nature and the amount of evidence

amassed by the State in aggravation, we cannot say, as the defendant urges us to do, that imposition of the death sentence here is an inappropriate punishment.

Defendant avers that she was denied a fair sentencing hearing because the State introduced "unreliable" evidence that she had committed "three robberies." She refers to the robberies of Clyde Simmons and Frederick Adamson, who did not themselves testify. Investigating police officers testified concerning the robbery of Simmons and the three robberies of Adamson. We note that an eyewitness, Floyd Blanchard, testified about the robbery of Adamson by defendant on July 4, 1989. Hearsay evidence of crimes that did not result in prosecution or conviction is admissible in death sentencing hearings as long as it is both relevant and reliable. (*Young*, 128 Ill. 2d at 54.) The determination of reliability and relevance lies within the sound discretion of the trial judge. (*Young*, 128 Ill. 2d at 53-54.) Defendant appears to take the position that this evidence is unreliable because it is hearsay and that it was improperly admitted because, in pronouncing it admissible, the circuit court considered only its relevance and not its reliability. Since defendant claims this testimony is unreliable only because it is hearsay and there is no suggestion in the record that it is unreliable for any other reason, we conclude that the circuit court did not abuse its discretion in admitting it into evidence.

Although defendant contends that the circuit court failed to consider fully and to give effect to the mitigating evidence of her good record while incarcerated as she awaited trial, the record does not support this contention, and we deem the issue one without merit. Similarly lacking in merit is defendant's assertion that she was denied a fair sentencing hearing when the circuit court allowed Emma Lipsey to testify that Billy Williams and his brother approached Lipsey later,

asking her not to go to court and offering to pay her dental bill. Billy Williams, who is unrelated to defendant, was dating her at the time in question. If the circuit court did err in the admission of this evidence, its impact upon the trier of fact could have been minimal at most and its effect upon the sentence imposed of no consequence whatever.

Defendant challenges the constitutionality of the death penalty statute in Illinois as violative of the eighth and fourteenth amendments for placing a burden of proof on the defendant that precludes meaningful consideration of evidence in mitigation. This court rejected such a claim in *People v. Hampton* (1992), 149 Ill. 2d 71, 117, in which the defendant made the same arguments that the defendant advances here. Having already determined that no such constitutional infirmity exists, we decline to reconsider the question.

Finally, defendant contends that the death penalty statute in Illinois is unconstitutional for failing to minimize sufficiently the risk of arbitrary or capricious imposition of a sentence of death. She acknowledges that this court has already considered individually the arguments she sets forth in this regard but asks us both to reconsider these contentions and to consider whether in their totality the features and omissions she cites render the statute unconstitutional. Inasmuch as the defendant puts forth no new arguments in support of her position, we refuse to reconsider the prior holdings of this court concerning the individual constitutional defects she identifies. Further, in *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43, this court rejected the argument that the cumulative effect of such features and omissions renders the statute constitutionally infirm:

"While this court is cognizant of that old adage that the whole is greater than the sum of its parts, we fail to see how such an adage could be of assistance in such a case as

this. If all of the individual aspects are constitutional, we stand by the conclusion that the whole is also constitutional."

This court has since seen no reason to disturb that decision (*People v. Ramey* (1992), 151 Ill. 2d 498, 559; *People v. Gosier* (1991), 145 Ill. 2d 127, 165), and we see none today.

Therefore, for the reasons stated above, the judgment of the circuit court of Cook County is affirmed. We hereby direct the clerk of this court to enter an order setting Tuesday, January 10, 1995, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in a manner provided by law (Ill. Rev. Stat. 1991, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where defendant is now confined.

*Affirmed.*