THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DELWIN CLARK, Defendant-Appellant.

First District (3rd Division)   No. 1—94—2975

Opinion filed March 27, 1996.

Gevirtz, Born & Kissel, of Northfield, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan R.

Schierl, and Julie Line Bailey, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Delwin Clark, was convicted of first-degree murder (720 ILCS 5/9—1 (West 1992)) and concealment of a homicidal death (720 ILCS 5/9—3.1(a) (West 1992)). He was sentenced to consecutive terms of 40 years' imprisonment for first-degree murder and three years' imprisonment for concealment of a homicidal death. On appeal, defendant asserts that (1) the State improperly injected race as an issue during jury selection; (2) the State did not prove him guilty of concealment of a homicidal death; (3) the trial court improperly considered certain victim impact statements during sentencing; (4) the consecutive sentences were improper; and (5) the sentences were excessive.

Caroline Baird, defendant's former girlfriend and mother of his five-year-old daughter, Brittany, testified that defendant was in her apartment from 4 p.m. to 6 p.m. on March 26, 1993, visiting with Caroline and watching videos with Brittany. Although defendant had previously moved out of the apartment, which was located at 2250 West Armitage Street, Chicago, he and Caroline still shared two automobiles, an Oldsmobile Delta 88 and a Chrysler Sundance.

That night, defendant returned around 8:30 or 9 p.m. to give Caroline $150 to pay bills. He stayed five minutes and put Brittany to bed. An hour later, Caroline spoke to her sister, Simone, who lived in the same building. After the phone call, Caroline and Brittany went to Simone's apartment. Caroline put Brittany to bed, then watched television and talked with her sister until Jason Hager, a neighbor, arrived at 10:30 p.m. The three of them talked, played cards, and drank beer.

At 12:30 or 12:45 a.m., Gregory Snipes, another neighbor, arrived. The atmosphere got lively as they went from playing cards to dancing and playing a drinking game called "Faces." They were still playing "Faces" at 1:15 a.m. when defendant arrived. He was upset because Caroline brought Brittany upstairs where the music was loud and everyone was drinking alcohol. When Hager told defendant that Brittany was asleep and that she was fine, defendant told him to stay out of his business.

At that point, Caroline went to check on Brittany, who was still asleep. While in the bedroom, she heard defendant and Simone arguing. She heard defendant yell, "I'll kill you, bitch," and Simone respond, "I know you will."

When Caroline heard a gunshot, she froze, then wrapped Brit-

tany up and went into the living room. She did not see defendant, but saw Snipes in the bathroom with his foot against the door, Simone running around the apartment, and a bloody Jason slumped on the futon couch.

Fifteen minutes later, an upset and despondent defendant came to her apartment. She asked him to leave, which he did, but he returned five minutes later. They spoke briefly and she again told him to leave.

Simone Baird testified that she was alone at 10 p.m. on March 26, 1993, when Caroline and Brittany came to her apartment. Simone's testimony regarding the events before defendant arrived was substantially the same as Caroline's. She also testified that she heard defendant screaming at Hager and a gunshot while she and Caroline were in her bedroom. Simone ran into the living room, where defendant was hysterical, screaming, and waving his gun, and Hager was slumped over on the bloody futon. Later, Simone and defendant went to Snipes' apartment and pounded on his door. When Snipes did not answer, defendant ran back upstairs. Simone returned to her apartment to find defendant picking up Hager's body and going out her back door to the rear staircase, which leads to the gangway.

Greg Snipes testified that he went to Simone's apartment shortly after midnight on March 27, 1993. Soon afterwards, there was a knock on the door. Defendant, who had a gun, kicked in the door, then pushed Hager onto a futon couch. As defendant stood over Hager saying "motherfucker, who is this motherfucker," Simone pleaded with him to stop, but he pointed the gun at her and said, "shut up, bitch, or I will shoot you." Defendant turned back to Jason, who did not have a gun. While defendant's gun was near Jason's mouth, it discharged. Jason fell onto the carpet, blood coming from his mouth.

Snipes ran into Simone's bathroom and barricaded himself behind the door. When defendant left several minutes later, he ran to his apartment on the second floor and locked the door behind him. Defendant knocked on his door and asked him to open it. Defendant promised not to hurt Snipes and said that the shooting was an accident, but Snipes refused to open the door. Sometime later, Snipes heard a thumping sound as if something was being dragged down the back stairs.

Soon after, Snipes looked out his window and saw defendant get into a car and drive away. Snipes ran from his apartment and took an el train to his sister's house, where he spent the night. The next evening, Snipes went to the police.

Linda Garcia testified that she spent the evening of March 26, 1993, with defendant. After they had dinner, they went to Quenchers

Tavern at Fullerton and Western Avenues in Chicago, where they stayed from 7:30 or 8 p.m. until 11:30 p.m. or midnight. Garcia and defendant walked around separately, socializing with friends in the crowded bar. Garcia saw defendant drink three or four shots of liquor.

Toward the end of the evening, defendant became upset and told Garcia he wanted to leave. After they got into defendant's Chrysler Sundance, Garcia became frightened when defendant reached under the driver's seat and pulled out a gun. Defendant drove to Caroline's apartment and parked six or seven houses from her building. Garcia told him to take the gun because she did not want it in the car, so defendant left with the gun while Garcia waited. Twenty minutes later, defendant returned. He was nervous and pale-looking. He told Garcia that she had to leave because "something had happened," but refused to explain.

Mainor Jiminez testified that he was at home at 2430 North Major Street, Chicago, between 8 and 8:30 a.m. on March 27, 1993, when his mother told him there was a man lying in the backyard. After running into the back yard and realizing that the man was dead, Jiminez called the police.

Officer Redmond, a forensic investigator, testified that he saw a blood smear on the alley pavement at 2430 North Major. While processing the scene, Redmond received a call to go to 2305 North Meade, which was five blocks away. There, in a garbage can, he found two bloodstained blankets, three pieces of carpeting, two manila envelopes with traces of blood, and a receipt from the Beaumont Beauty School with an identification number for a student named "Clark."

Redmond then received a call to go to 2213 McClean, which was near the scene of the killing, but four or five miles from where the body was found. There, a bloody beige trench coat, a bloody black and white futon mattress, and a beige mattress cover were found in a garbage can. At 2250 West Armitage Avenue, Redmond found bloodstains in the alley and on the rear stairway.

Detective Hugh Conwell found identification on Hager's body that indicated his address was 2250 West Armitage Avenue. Conwell went to that address, where he saw bloodstains in the gangway behind the building. After the building owner unlocked the doors, Conwell went up the back staircase and followed blood marks going up the stairs to Simone's apartment on the third floor. There was a stipulation that serologist Cecilia Doyle would testify that the blood on the objects found in the garbage cans and the blood on the second-floor landing at 2250 West Armitage were consistent with Hager's blood.

Dr. Robert Kirschner, who conducted the autopsy, testified that Hager died from a gunshot wound to his mouth. Gunpowder burns and residue inside Hager's mouth indicated that the gun barrel was in his mouth when it was fired.

Defendant testified that the shooting was accidental and the result of self-defense. After leaving Caroline's apartment at 6 p.m. on March 26, 1993, defendant and Garcia went to Quenchers, where they arrived about 7 p.m. While at Quenchers, one of his customers gave him a $150 money order as payment for cosmetology services. Around 9 or 9:30 p.m., defendant went to Caroline's apartment to give her the money order so that she could pay some bills. He stayed for five minutes before returning to Quenchers, where he stayed another two hours.

Shortly after midnight, defendant left Quenchers alone. He said that Garcia told him she would get a ride home with friends. Defendant claimed that he returned to Caroline's apartment because she had paged him. He denied having a gun in his car or on his person.

When defendant found that Caroline and Brittany were not home, he called Simone. He wanted to know why Brittany was not in her own bed. Simone told him that she would tell Caroline to bring Brittany back down, so he went to get food at a nearby restaurant. When he returned at 1 a.m., Caroline and Brittany were still not home. Angry, defendant went to Simone's apartment, where he heard loud music playing.

He entered the apartment and saw Snipes and Hager sitting in the living room with drinks and cocaine paraphernalia nearby. According to defendant, he argued with Simone and Caroline about Brittany's welfare. When Hager interjected that Brittany was sleeping and was all right, defendant turned to him and said, "motherfucker, mind your own business, it's my daughter," then turned to Caroline, who began backing away. Snipes ran into the bathroom as Hager came up behind defendant with a black revolver.

Defendant claimed that he turned around and grabbed Hager's hand. As the two struggled and fell over a coffee table, everyone left defendant and Hager alone in the living room. According to defendant, the gun discharged as he and Hager struggled over the gun, but he did not know how the gun got inside Hager's mouth.

After the shooting, defendant left the apartment and drove around in the Sundance. He denied banging on Snipes' door and admitted to going to Caroline's apartment only once. Defendant stated that he was hysterical, in shock, and scared. When defendant returned to Simone's apartment to move Hager's body, she was gone. Defendant wrapped Hager's upper body in blankets and carried him

down the rear stairs to the gangway. He put the body in Caroline's Delta 88, then drove around until he put Hager's body in a backyard so that it would "be found right away." Defendant did not remember dragging the body or throwing out the blankets and futon cover although he did remember throwing things in garbage cans. He was not sure where he put the gun.

The next day, he became scared when he was paged by a police officer, and he left for Miami the following week. He was subsequently arrested in Miami and extradited to Illinois.

Following deliberations, the jury found defendant guilty of first-degree murder and concealment of a homicidal death. He was sentenced to consecutive terms of 40 years' imprisonment for first-degree murder and three years' imprisonment for concealment of a homicidal death.

The first issue is whether the trial court erred when it allowed the State to ask the prospective jurors during *voir dire* about their views on interracial relationships. Because all but one of the State's civilian witnesses were involved in interracial relationships, the prosecution wanted to determine whether a prospective juror's feelings on the subject would prevent him or her from being fair and impartial.

Defense counsel objected, arguing that such an inquiry would be unnecessarily intrusive into the prospective jurors' lives. Recognizing that this was a sensitive issue, the trial court stated that "any issue which may impact on [the prospective jurors'] abilities to be fair is an appropriate area of inquiry." The court sustained defendant's objection to the court posing the question, but refused to preclude either party from questioning veniremembers on the issue.

During the questioning, the prosecutor asked the following question:

"[D]uring this trial you will hear substantial evidence of several witnesses who are involved in interracial relationships or dating situations.

Is there anyone here who would have such strong feelings about that or against that, that that fact alone would prevent them from giving either the State or Defense a fair trial?"

Two prospective jurors, Ms. Carstens and Ms. Johnson, raised their hands and stated their prejudice. The trial court gave the following explanation:

"[T]his is not *** a vote on interracial dating. It's a fact that is going to come up in the trial, but you're not here to vote yes or no about it. ***

You're here to make a decision about whether or not the issues

which I read to you from the indictment, those issues must be proven beyond a reasonable doubt. And if they are, then the jury's obligation is to render a verdict in line with the facts that they find. Whether it's guilty or not guilty, that's the jury's obligation.

If because there was some evidence of interracial dating you could not do that, you would be so bothered by it or so prejudiced by it that you'd be unable to be fair to either side, then you should not be a juror.

But if that fact alone, just like the fact that there's guns involved in the case, is just another issue in society that each person has to make their own decision about but it wouldn't affect your ability to be fair and render a verdict, then you still should be a juror. So that's really what we are talking about."

After that, Ms. Johnson indicated that the interracial dating issue would not have an effect on how she found the issues presented, but Ms. Carstens stated that she could not sign any verdict form and was excused for cause.

Later in the jury selection process, defense counsel argued that the State's question could tend to exclude prospective white jurors from the jury. The court stated:

"My general rule for picking juries is that any issue which is going to come up, the lawyers are entitled to ask the jury if it's going to affect it.

* * *

I'm overruling your objection. I don't think that that issue is improper since in fact it's going to come up. And I think to pretend that it isn't an issue in some peoples [sic] lives and just to think that it isn't going to bother somebody— obviously it did bother a couple people. They put their hands up. So I think that verifies what the State's position was; however objection is overruled."

■ The purpose of *voir dire* is to enable the trial court to select an impartial jury and to ensure that the attorneys have an informed and intelligent basis on which to exercise peremptory challenges. *Mu'Min v. Virginia*, 500 U.S. 415, 431, 114 L. Ed. 2d 493, 509, 111 S. Ct. 1899, 1908 (1991); *People v. Howard*, 147 Ill. 2d 103, 136, 588 N.E.2d 1044 (1991). The trial court has broad discretion in conducting the *voir dire* examination (*Ham v. South Carolina*, 409 U.S. 524, 527, 35 L. Ed. 2d 46, 50, 93 S. Ct. 848, 851 (1973)), for which there is no abuse if the questions posed and the procedures used created a reasonable assurance that any prejudice present would be discovered. *People v. Diggs*, 243 Ill. App. 3d 93, 96, 612 N.E.2d 83 (1993).

Defendant argues that the prospective jurors should not have been asked about any prejudices against interracial relationships

because there were no racial issues inextricably bound to the facts of the trial. He contends that interracial relationships had nothing to do with the murder and that interracial relationships between him and several State witnesses were not a basis for injecting race into the trial.

Defendant relies on *Turner v. Murray*, 476 U.S. 28, 90 L. Ed. 2d 27, 106 S. Ct. 1683 (1986), *Rosales-Lopez v. United States*, 451 U.S. 182, 68 L. Ed. 2d 22, 101 S. Ct. 1629 (1981), *Ristaino v. Ross*, 424 U.S. 589, 47 L. Ed. 2d 258, 96 S. Ct. 1017 (1976), *Ham v. South Carolina*, 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848 (1973), *People v. Peeples*, 155 Ill. 2d 422, 616 N.E.2d 294 (1993), *People v. Watson*, 263 Ill. App. 3d 551, 558, 635 N.E.2d 795 (1994), and *Diggs*, 243 Ill. App. 3d 93, 612 N.E.2d 83, which all consider whether the defendant had the constitutional right to require the trial court to question veniremembers about issues of racial prejudice.

While the United States Constitution requires the trial court to question venirepersons specifically regarding racial prejudice if "special circumstances" exist that suggest a constitutionally significant likelihood that racial prejudice might infect a defendant's trial (*Turner v. Murray*, 476 U.S. at 32, 90 L. Ed. 2d at 34, 106 S. Ct. at 1686; *Peeples*, 155 Ill. 2d at 460), that is not the issue in this case. The issue is whether the trial court abused its discretion by permitting the State to ask the prospective jurors about possible biases against persons involved in interracial relationships, not whether defendant has a constitutional right to have the prospective jurors asked that question.

■ We hold that the trial court did not abuse its discretion in allowing the State to ask whether any of the prospective jurors would be unable to be fair and impartial because of the witnesses who were involved in interracial relationships. In our society, there are a considerable number of people of all races who have strong negative feelings about interracial relationships. It was important to know if any of the prospective jurors had such negative feelings about these relationships that he or she could not be fair and impartial. Since nearly all the State's civilian witnesses were involved in interracial relationships, it was reasonable for the State to inquire into that area.

The next issue is whether the State proved defendant guilty of concealment of a homicidal death beyond a reasonable doubt. Defendant argues that he is not guilty of concealment of a homicidal death because he was not trying to hide the body. He claims that he neither prevented nor delayed the body's discovery, but left it in plain and open view in the Jiminez's backyard so that it would be found

right away. He further contends that he moved the body because he was scared for himself and his daughter if the body were discovered in Simone's apartment.

■ To convict defendant of concealment of a homicidal death, there must be (1) an act of concealment, and (2) the mental state of knowledge that the victim has died by homicidal means. *People v. Hummel*, 48 Ill. App. 3d 1002, 1004, 365 N.E.2d 122 (1977); 720 ILCS 5/9—3.1 (West 1992). This is a factual issue for the jury to decide. In addition to being instructed on the elements of concealment of a homicidal death, the jury was given Illinois Pattern Jury Instructions, Criminal, No. 7.14 (3d ed. 1992), which defines "concealed" as follows:

> "The word 'concealed' means the performing of some act or acts for the purpose of preventing or delaying the discovery of a death by homicidal means. 'Concealed' requires something more than simply withholding knowledge or failing to disclose information." Illinois Pattern Jury Instructions, Criminal, No. 7.14 (3d ed. 1992).

■ The jury heard and evaluated the evidence and was properly instructed. Contrary to defendant's assertions, the concealment of the body does not have to occur at the body's final resting place. It can also occur when the body is removed from the murder scene and transported for the purpose of preventing or delaying the discovery of the homicide. In this case, defendant wrapped the body in blankets and a futon mattress, put it in a car, drove around for awhile, then dumped the body four or five miles from the murder scene. He also disposed of bloody items from the murder in several different garbage cans. Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the essential elements of concealment of a homicidal death beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985); *People v. Hood*, 229 Ill. App. 3d 202, 210, 593 N.E.2d 805 (1992). We affirm defendant's conviction.

Defendant also raises several sentencing issues. First, defendant asserts that the consecutive sentences were improper because there was no basis to find that they were necessary to protect the public. Defendant was sentenced pursuant to section 5—8—4(b) of the Unified Code of Corrections, which provides as follows, in pertinent part:

> "The court shall not impose a consecutive sentence *** unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5—8—4(b) (West 1994).

Consecutive sentences should be imposed sparingly (*People v. O'Neal*, 125 Ill. 2d 291, 298, 531 N.E.2d 366 (1988); *People v. Lopez*, 228 Ill. App. 3d 1061, 1076, 593 N.E.2d 647 (1992)) and are to be imposed only where the nature and circumstances of the offense and the history and character of the defendant indicate that a consecutive term is required to protect the public from further criminal conduct of the defendant (*People v. Burrell*, 228 Ill. App. 3d 133, 148, 592 N.E.2d 453 (1992); 730 ILCS 5/5—8—4(b) (West 1994)).

During the sentencing hearing, the trial court stated:

> "There is no reason to believe that Delwin Clark is the kind of person who is a danger to the community and goes around killing people because looking at his past life as the State has indicated, his past activities, there is nothing there to indicate that he is a violent or dangerous man."

■ Given the statute, the trial court's comments during sentencing, and the facts of this case, we find that the consecutive sentences were given erroneously. For that reason, we modify the sentences from consecutive sentences to concurrent sentences.

■ Defendant also contends that his sentence was excessive in light of the circumstances of the case, his character, and his background. He contends that the shooting occurred because he was angry over his daughter being in an apartment where everyone was drinking and cocaine paraphernalia was present. He stresses that his panic following the shooting shows that his act was not deliberate or planned in any way. Furthermore, he expresses that he was 28 years old at the time of the shooting, had no criminal background, was a responsible father, and supported himself and his family.

Where the sentence imposed is within the statutory limits, a reviewing court can exercise its power to reduce the sentence if it finds that the trial court abused its discretion. *People v. Cabrera*, 116 Ill. 2d 474, 493-94, 508 N.E.2d 708 (1987). After considering all the relevant factors presented in aggravation and mitigation, we conclude that the trial court abused its discretion when it sentenced defendant to 40 years' imprisonment. Thus, we reduce the sentence for first-degree murder to 25 years' imprisonment.

Because we have reduced defendant's sentence, we will not address the victim impact statements given during the sentencing hearing.

Based on the foregoing reasons, we affirm defendant's conviction for concealment of a homicidal death. However, we reduce defendant's sentence to 25 years' imprisonment for first-degree murder and make

it concurrent with his three-year sentence for concealment of a homicidal death.

Affirmed; sentence reduced in part and modified in part.

RIZZI, P.J., and TULLY, J., concur.