FIFTH DIVISION
November 24, 2010

No. 1-09-0879

THE PEOPLE OF THE STATE OF ILLINOIS,     )      Appeal from the
    )      Circuit Court of
          Plaintiff-Appellee,         )      Cook County.
    )
      v.                      )      04 CR 11607
    )
WILLIAM JOHNSON,            )      The Honorable
    )      Kerry M. Kennedy,
          Defendant-Appellant.      )      Judge Presiding.

JUSTICE TOOMIN delivered the opinion of the court:

In this appeal, we revisit the "special circumstances" mandating a trial court to put supplemental questions to prospective jurors regarding racial bias. Defendant, William Johnson, was convicted by a jury of home invasion and armed robbery and sentenced to 10 years' imprisonment for home invasion, enhanced by 15 years for committing the offense while armed with a firearm, together with a consecutive sentence of 15 years for armed robbery. He appeals contending the trial court: (1) erred in rejecting his supplemental questions during *voir dire* regarding racial and ethnic bias; and (2) failed to comply with the mandate of Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007). For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

Defendant was jointly indicted, with Jose Torres,[1] for various offenses including, *inter alia*, first degree murder, armed robbery, attempted first degree murder, and home invasion stemming from a series of events that took place on March 26, 2004. Defendant does not challenge the sufficiency of the evidence supporting his conviction. Consequently, we review only the evidence relevant to understand and resolve the procedural issues presented with respect to jury selection.

The State's case against defendant rested primarily on the statement of Jose Torres. Defendant and Torres both worked for an ambulance company and had known each other for about two years leading up to March 2004. Torres testified that defendant was his best friend at that time. Defendant, his wife, Jennifer, and their two children shared their home with defendant's mother-in-law, Barbara Kane.

According to Torres, in mid-March 2004, defendant approached him with a plan to rob Ralph Burke, Barbara Kane's boyfriend. Kane allegedly told defendant that Burke kept large amounts of cash in his home. The plan called for one of them to pose as a postal employee and pretend to deliver a package to Burke's home. When Burke answered the door, the men would "quietly bring him back into his apartment and tie him up and relieve him of any cash that was in

___

[1] Torres pled guilty prior to trial, testified at defendant's trial, and is not a party to this appeal. Torres was charged in those counts alleging attempted first degree murder, home invasion, defacing identification marks on a firearm, aggravated battery, aggravated unlawful restraint, and unlawful use of weapon.

the house." Defendant told Torres there was approximately $120,000 in cash in the apartment. Although Torres initially declined defendant's invitation, following further discussions, Torres agreed to join defendant in the robbery.

Torres further testified that on March 26, 2004, defendant arrived at Torres' home carrying a backpack containing a postal jacket and hat, two ski masks, a pair of black gloves, a collapsible baton, and a pistol. Defendant was wearing a dark blue, hooded windbreaker, black jogging pants, and gym shoes. He was also wearing another pair of jogging pants beneath the visible pair. According to Torres, defendant dressed in this manner to add bulk to his frame to frustrate Burke's ability to recognize him. Also, defendant wanted to enter wearing one thing and leave wearing something else, again, to make recognition difficult. Defendant instructed Torres to wear the postal jacket and hat. Torres put on the gloves, but had to tape them because they were too big. Defendant also gave Torres the pistol. Torres brought a "travel suitcase," containing a hammer, screwdriver, tape, and plastic bags.

Defendant drove Torres' car to Burke's residence with Torres riding in the backseat. According to Torres, "[T]he plan was for me to wait for him to open the door to show him that I had a package which was the suitcase, but I panicked. I went too soon. I showed him the pistol." Defendant was standing behind Burke and struck him about the head and torso with the baton. Defendant then opened the door for Torres and took the gun from him. Defendant returned to Burke's apartment and continued beating him. Although Torres initially entered the apartment, he panicked as the beating continued and fled to the parking lot.

Torres testified that he was then struck by a car, while he and defendant were leaving

3

Burke's apartment. Defendant reached into the car and struggled with the driver, who was later determined to be Steven Tischer. As he did so, defendant pulled the pistol out and "clicked it a few times in [the driver's] chest." Torres grabbed defendant and told him they had to go. They fled the scene, disrobing as they went. Torres placed the postal jacket and mask inside the suitcase. Defendant gave him the baton, which Torres placed in the suitcase. Defendant was then confronted by another witness. Ultimately, Torres fled and was taken into custody a short distance away.

The night before the incident, Burke went to defendant's home to say goodbye because he and Barbara were leaving for Hawaii the following day. Defendant left shortly thereafter, and Barbara "thought it was odd that [defendant] didn't stay and visit with [Burke]." Barbara testified that her relationship with defendant was "fine." She described the relationship between defendant and Ralph Burke as friendly.

Ralph Burke testified that in March 2004, he had been dating Barbara Kane, defendant's mother-in-law, for approximately five months. Over that time, he had been with defendant about a dozen times. Burke recounted spending time with defendant and even asking him to help fix his computer. At approximately 10 a.m. on March 26, 2004, Burke was in his apartment talking to his friend Steve Tischer. Burke was scheduled to leave on vacation the following day and was briefing Tischer on housekeeping matters during Burke's absence and asking Tischer to keep an eye on Burke's elderly mother.

During their conversation, the doorbell rang. When Burke opened his apartment door, he saw a masked man in a postal uniform holding a gun and heard him calling Burke's name. As he

4

turned to reenter his apartment, he was struck on the head with a hard object. The beating continued and Burke was taken toward his kitchen. Burke saw Tischer standing outside on the balcony and tried to get him to call the police. One of the two assailants then left. The one that remained had a gun in his hand. Both of the intruders wore masks during the encounter.

Steve Tischer testified that he was leaving Burke's home when the home invasion occurred. He saw the masked individual striking Burke. Tischer proceeded to his car intent on driving around looking for a police officer. As he entered the car, two masked men approached from behind the building. One of them, a light-skinned African-American, put a gun to his head and pulled the trigger five times, but the gun never fired.

Tischer then saw the two men reenter Burke's building, and he made a U-turn and drove toward them. The men then exited the building and the shorter of the two men, later determined to be Torres, was holding a suitcase. As Tischer followed the men, Torres removed his mask, revealing his full face to Tischer. When Tischer's car was between the two men, defendant again pointed the gun at Tischer and pulled the trigger. The two men separated and Tischer followed Torres. A concerned citizen came over and detained Torres. Tischer took the suitcase from him and placed it in his car. When police arrived and took Torres into custody, Tischer turned over the suitcase to them. Thereafter, Tischer identified defendant, whom police had in custody. He thought he recognized defendant as the son-in-law of Burke's girlfriend.

Betty Johnson testified to seeing her friend, Clara Daniels, return to their apartment complex in her green Saturn automobile. Johnson saw Daniels carrying bags in from her car and proceeded downstairs to help her with them. Johnson's attention was drawn to the landing above

her when she heard Daniels and saw someone with Daniels. Then, Daniels came down the stairs, carrying her wallet and keys, with a man behind her. The man, wearing dark clothes and a mask, was pointing a gun at Johnson's face. Johnson then descended the stairs and yelled out for help. As she headed down, she turned back to see the man reach for Daniels. Upon reaching the bottom of the stairs, she heard a "thug" and Daniels was lying at the bottom of the stairs. When Johnson returned to the parking lot, she noticed that Daniels' car was gone. While a responding officer reported that Daniels said the offender was possibly Hispanic, she denied saying she that she believed the offender was a male Hispanic. According to Daniels, she "couldn't tell. I had no idea."

Daniels was hospitalized and then placed in a rehabilitation center. She died there on April 10, 2004, as a result of a blood clot that initially formed in her legs and progressed to her lungs. The medical examiner concluded the manner of death was homicide. However, a defense expert opined that the clot developed because she was taken off her blood-thinning medication while at the rehabilitation center.

Shortly after the green Saturn was located, defendant was taken into custody. He was first observed standing on the deck of a home adjacent to Evergreen Cemetery. Although he told a responding officer that he lived there, the officer spoke to a neighbor and confirmed that no one should be there at that time of day. Officers then searched the area surrounding the house. Defendant was found hiding in a garbage can, wearing a "tight" black T-shirt and a pair of white long underwear bottoms.

During a search of the area, officers found a black glove with duct tape on it lying in an

intersection. Additionally, a black ski mask was found atop a garbage can near where the Saturn was abandoned. A jacket with a silver cellular phone and a 9-millimeter round in the pocket, was found in another garbage can in the same location. Approximately 25 feet from the second garbage can, another officer located a gun next to a garage. In an adjacent alley, an officer located a pair of black gloves and a pair of black pants in two separate garbage cans.

Following the arrest of defendant and Torres, a search of the black duffel bag taken from Torres was found to contain a hammer, a screwdriver, clear tape, and blue plastic garbage bags. The blue hooded postal jacket was also recovered from Torres, which contained a collapsible baton in the pocket. Additionally, a black glove, which matched a second one found along the defendants' escape route, was found in the duffel bag. Another 9-millimeter round was found during the processing of Burke's residence. A jacket and backpack were located on the roof of a shed in the area approximately two days later. The jacket was determined to contain the keys for the green Saturn, as well as a 9-millimeter shell casing. The backpack was marked with "W Johnson" inside one of its flaps.

During processing at Cook County jail and Cermak Hospital, defendant spoke to Torres. He explained what happened after the two parted ways and how Clara Daniels was involved in the series of events. Torres described defendant explaining how his plan was to take Daniels hostage until the situation calmed down. When defendant reached for the woman's keys, he was startled by the approach and screaming of another woman. Defendant told Torres he then hit the first woman in the face. Torres added, "Then he said he tossed the bitch."

Defendant did not testify at trial, though evidence was presented on his behalf. None of

1-09-0879

that evidence is relevant to the issues considered here.

ANALYSIS

Defendant's first claim of error stems from the trial court's refusal to pose certain supplemental questions to potential jurors during *voir dire*. The questions appear in the record on copies of sheets of looseleaf paper, each in a different hand. The questions on the first page were as follows:

"Will the fact that the Defendant is black cause you to prejudge his guilt[?]

Will the fact that an accomplice witness is [H]ispanic cause you to prejudge his credibility[?]

Are you related to, or do you care for anyone over the age of eighty. Describe relationship[?]

Do you have opinion [*sic*] about whether a criminal Defendant should testify at his own trial[?]"

The trial judge denied each of these tendered questions. Prior to ruling on the question regarding defendants testifying, the judge observed, "I think it is covered." Nevertheless, defense counsel was afforded an opportunity to argue for his position.

The second set of questions consisted of the following:

"Describe any opinion you may have concerning Hispanic people[.]

Describe any opinion you may have concerning African-American people.

Do you have any living relatives who are 80 yoa [*sic*] or older:

8

[Undecipherable]

– Who cares for the relative[?]

– How often do you speak to the relative[?]

– How often do you visit the relative[?]"

The trial judge allowed only the third question to be asked. Yet, in his brief, defendant cites only to the page containing the first set of questions.

Defendant maintains that the proposed questions were necessary as, "[R]ace was an inherent issue *** because [defendant], an African American, was married to a Caucasian woman and was accused of committing violent acts towards a member of her family, as well as against two other Caucasian individuals, with his accomplice, who is Hispanic." As an initial matter, we perceive that this narrative overstates the relationship of the victims. While Ralph Burke was Barbara Kane's boyfriend for approximately five years leading up to the trial, he was not family to Jennifer Kane. Likewise, at the time of the alleged offense, Kane and Burke's relationship was only five months old.

The State contends that defendant forfeited this argument by failing to object at trial and not including this matter in his posttrial motion. Defendant counters noting that Supreme Court Rule 615(a), or the plain-error doctrine, delineates an exception permitting review of issues otherwise subject to procedural default. *People v. Lewis*, 234 Ill. 2d 32, 42, 912 N.E.2d 1220, 1226-27 (2009); 134 Ill. 2d R. 615(a). Our supreme court described the circumstances under which the doctrine is operative in *People v. Piatkowski*:

"[T]he plain-error doctrine allows a reviewing court to consider unpreserved

9

error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the serousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2007), citing *People v. Herron*, 215 Ill. 2d 167, 186-87, 830 N.E.2d 467, 479 (2005).

Rule 615 specifically provides that, "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." 134 Ill. 2d R. 615(a). "Essentially, the fairness of the trial must be undermined." *People v. Keene*, 169 Ill. 2d 1, 17, 660 N.E.2d 901, 910 (1995). Our precedent teaches that the burden of persuasion as to the two prongs falls upon those defendants seeking the application of the doctrine. *People v. Naylor*, 229 Ill. 2d 584, 593, 893 N.E.2d 653, 659 (2008). Where a defendant cannot carry the burden, it is incumbent upon us to honor the procedural default. *Naylor*, 229 Ill. 2d at 593, 893 N.E.2d at 659-60.

Before approaching the procedural viability of the claim, we must ascertain whether an error actually occurred. *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227, citing *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009). Accordingly, we consider the substance of defendant's claim of error. *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227.

The overarching objective of *voir dire* is to select a panel of jurors free from bias or prejudice. *People v. Terrell*, 185 Ill. 2d 467, 484, 708 N.E.2d 309, 318 (1998). This purpose adheres to the well-settled principle that defendants in criminal trials have a basic constitutional

10

right to an impartial jury. *People v. Peeples*, 155 Ill. 2d 422, 458-59, 616 N.E.2d 294, 311 (1993). As our supreme court observed in *Terrell*:

> "The primary responsibility of conducting the *voir dire* examination lies with the trial court and the manner and scope of such examination rests within that court's discretion. [Citations.] Indeed, the trial court possesses great latitude in deciding what questions to ask during *voir dire*. [Citation.]" *Terrell*, 185 Ill. 2d at 484, 708 N.E.2d at 318.

See also 177 Ill. 2d Rs. 234, 431.

It is axiomatic that, "It is the duty of the trial court to manage the *voir dire*." *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311, citing *People v. DeSavieu*, 120 Ill. App. 3d 420, 427, 458 N.E.2d 504, 509 (1983). Thus, the decision to permit supplemental questions by counsel duirng *voir dire* is within the discretion of the trial court. *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311. On review, a trial court will be found to have abused that discretion "only if, after a review of the record, it is determined that the conduct of the court thwarted the selection of an impartial jury." *People v. Williams*, 164 Ill. 2d 1, 16, 645 N.E.2d 844, 850 (1994). Likewise, judging the veracity of the responses provided by venirepersons during *voir dire* is left to the sound discretion of the trial judge conducting the proceedings. *Williams*, 164 Ill. 2d at 17, 645 N.E.2d at 851.

The touchstone for inquiry concerning racial prejudice during *voir dire* derives from *Ristaino v. Ross*, 424 U.S. 589, 47 L. Ed. 2d 258, 96 S. Ct. 1017 (1976). In *Ristaino*, the Supreme Court observed that defendants do not enjoy a constitutional entitlement to *voir dire* questioning "directed to matters that conceivably might prejudice veniremen against him."

1-09-0879

*Ristaino*, 424 U.S. at 594, 47 L. Ed. 2d at 263, 96 S. Ct. at 1020. Yet, "[S]ome cases may present circumstances in which an impermissible threat to the fair trial guaranteed by due process is posed by a trial court's refusal to question prospective jurors specifically about racial prejudice during *voir dire*." *Ristaino*, 594 U.S. at 595, 47 L. Ed. 2d at 263, 96 S. Ct. at 1021.

It is well settled that questioning of potential jurors regarding racial viewpoints is required only where " 'special circumstances' " are present, giving rise to a "constitutionally significant likelihood" that racial prejudice would possibly infect the proceedings. *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311. Such circumstances exist where issues of race are " 'inextricably bound up with the conduct of the trial.' " *Peeples*, 155 Ill. 2d at 459-60, 616 N.E.2d at 311, quoting *Ristaino*, 424 U.S. at 596-97, 47 L. Ed. 2d at 264, 96 S. Ct. at 1021, explaining *Ham v. South Carolina*, 409 U.S. 524, 35 L. Ed. 2d 46, 93 S. Ct. 848 (1973). Decidedly, however, "the mere fact that the petitioner is black and [the] victim is white does not constitute a 'special circumstance' of constitutional proportions." *Turner v. Murray*, 476 U.S. 28, 33, 90 L. Ed. 2d 27, 35, 106 S. Ct. 1683, 1687 (1986) (opinion of White, J., joined by Stewart, Blackmun, and Powell, JJ.).

The highest court in the land has found no constitutional presumption of juror bias for or against any members of any particular race or ethnic group. *Rosales-Lopez v. United States*, 451 U.S. 182, 190, 68 L. Ed. 2d 22, 29, 101 S. Ct. 1629, 1635 (1981) (opinion of White, J., joined by Stewart, Blackmun, and Powell, JJ.). Moreover:

"Only when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case does the trial court's denial of a

12

defendant's request to examine the jurors' ability to deal impartially with this subject amount to an unconstitutional abuse of discretion." *Rosales-Lopez*, 451 U.S. at 190, 68 L. Ed. 2d at 29, 101 S. Ct. at 1635 (opinion of White, J., joined by Stewart, Blackmun, and Powell, JJ.).

"To be constitutionally compelled, it is not enough that a *voir dire* question be helpful, rather, the trial court's failure to ask the question must render the defendant's proceedings fundamentally unfair." *Terrell*, 185 Ill. 2d at 485, 708 N.E.2d at 319.

Defendant's bold characterization of race as an "inherent issue" in the proceedings below is problematic. Actually, the record belies the claim, as there are but minimal references concerning race, the majority of which emanate from the defense. At the onset of his opening statement, defense counsel offered, "[Defendant] is here today because he made the unfortunate mistake of jogging in a mostly white neighborhood." Thereafter, counsel wove in an exaggerated racial thread as he told the jury:

> "[Defendant] married a girl named Jennifer who is white. Jennifer's mom is Barbara Kane. Barbara Kane at the time all of this happened was dating Ralph Burke. That's right. They all know each other, and they know each other well.
>
> I'm here to tell you that they knew each other well, and that Ralph Burke will testify. Ralph Burke is a racist. He has white power propaganda littering his home, and he is the worst kind of racist. He is the kind that hides it. He will tell you about the heinous crime of home invasion. He will give you great detail about being beaten, but he will give you no detail about why. He will attempt to hide from you

the true nature of his business.

You must require him to explain why he thinks that the son-in-law of his girlfriend came to his house in the middle of the workday and beat him.  If that's what indeed he intends to talk about.  He will certainly take that witness stand and point to [defendant] and say, [']That's the person that beat me.['] He will do that.

And I tell you he must do this because now it is too late to tell the truth and make himself out to be a fool.  But I want you to know that when he takes that witness stand he will make himself out to be a fool.

His friend, Steven Tischer will back his story and join the ranks of lemmings who back stories like that because it's the most convenient thing to do."

By these comments, defense counsel essentially tainted the proceedings with an issue irrelevant to the charges, the victims, or the accused.  His invective was substantially innuendo, clearly unsupported by evidence presented at trial.  Other than these initial comments, there were precious few incidental comments or mentions of the race of the perpetrators.  Notably, closing arguments, given by defendant's other counselor, contained nothing remotely touching upon racial concerns.

Manifestly, the offenses under consideration were lacking racial content, instead encompassing coincidence and opportunity.  As noted, defendant learned of the alleged stash of money from his mother-in-law, Barbara Kane, who was dating the victim.  Torres claimed he became involved in the scheme by virtue of his friendship with defendant and difficult financial straits he was experiencing.  Clara Daniels simply was in the wrong place at the wrong time,

sustaining grievous injury as defendant fled the crime scene.

Additionally, there was no positive identification of the perpetrators at the time of the incident because they were wearing masks. Instead, Torres was followed by Tischer until police arrived. Defendant was followed and then tracked by police to the garbage can where he had secreted himself. In turn, the evidence linking defendant and Torres to the offenses developed from the testimony of Torres and other witnesses, including those who collected evidence previously described by Torres. The prosecution below had nothing to do with the racial or ethnic characteristics of those involved. Neither the State's theory of the prosecution nor the evidence demonstrated, in any fashion, that the crimes were motivated by race or ethnicity. Consequently, posing the proposed questions to the members of venire was irrelevant and, moreover, would have tended to inject considerations of race into a case where the issue was absent.

Defendant's repeated reference to the prominence of interracial relationships to the case is simply not supported by the record. While the jurors may well have observed or deduced that defendant was African-American and his wife was Caucasian, this fact had absolutely no bearing upon the prosecution. Moreover, this position is a remarkable extension of the content of the proposed questions. None of the questions even remotely addressed matters of interracial relationships. Instead, they were addressed to vague and general issues of personal opinions and prejudice. When the proposed questions were discussed on the record, no mention is made nor argument offered that the questions relate to defendant's marital status or the interracial nature of his marriage. The lone argument in this regard is addressed to the general racial status of

defendant and Torres.

Defendant relies significantly upon the holding in *People v. Clark*, 278 Ill. App. 3d 996, 664 N.E.2d 146 (1996), in support of his argument that the trial court erred. In *Clark*, the State was permitted to pose questions to the prospective jurors concerning their views on interracial relationships. In doing so, the State endeavored to determine whether the jurors' ability to be fair and impartial would be affected where all of the State's witness, with one exception, were involved in interracial relationships. *Clark*, 278 Ill. App. 3d at 1002, 664 N.E.2d at 150. The trial judge acknowledged that this was a "sensitive issue" and because it could impact on the jurors' ability to be fair and impartial the questions were appropriate. In turn, the defense objection was sustained to the extent of the judge asking this type of question. *Clark*, 278 Ill. App. 3d at 1002, 664 N.E.2d at 150. However, the parties were permitted to question the venire on this subject. *Clark*, 278 Ill. App. 3d at 1002, 664 N.E.2d at 150.

The court in *Clark* provided the following context for their assessment:

"While the United States Constitution requires the trial court to question venirepersons specifically regarding racial prejudice if 'special circumstances' exist that suggest a constitutionally significant likelihood that racial prejudice might infect a defendant's trial [citations], that is not the issue in this case. The issue is whether the trial court abused its discretion by permitting the State to ask the prospective jurors about possible biases against persons involved in interracial relationships, not whether defendant has a constitutional right to have the prospective jurors asked that question." *Clark*, 278 Ill. App. 3d at 1004, 664 N.E.2d at 152.

In concluding that the trial court did not abuse its discretion, the *Clark* court observed: "In our society, there are a considerable number of people of all races who have strong negative feelings about interracial relationships." *Clark*, 278 Ill. App. 3d at 1004, 664 N.E.2d at 152. Because of the prevalence of interracial relationships amongst the State's witnesses, it was, therefore, important and reasonable to inquire into the ability of prospective jurors to be fair and impartial to those witnesses involved in such relationships. *Clark*, 278 Ill. App. 3d at 1004, 664 N.E.2d at 152. No such concerns were present in the case *sub judice*. Likewise, the issue presented in the case at bar is addressed to whether the trial judge properly exercised his discretion in refusing to ask the questions submitted. The record does not support a finding that it was either reasonable or important to probe these areas during *voir dire*. As noted, the questions proposed by defense counsel did not address interracial relationships. While interracial relationships were relevant to the proceedings in *Clark*, the same cannot be said for defendant's case.

Having reviewed the record, we conclude the trial court did not abuse its discretion in refusing to ask the supplemental *voir dire* questions addressed to race. There was nothing to be gained by them and "asking the questions would inject the subject of race into the trial when it was previously absent." *Peeples*, 155 Ill. 2d at 459, 616 N.E.2d at 311. The calculus does not change in light of defendant's interracial marriage. That fact was at best tangential to the proceedings. Moreover, the trial court's refusal to ask these questions did not thwart the selection of a fair and impartial jury. *Williams*, 164 Ill. 2d at 16, 645 N.E.2d at 850; see also *People v. Rivera*, 307 Ill. App. 3d 821, 832, 719 N.E.2d 154, 163-64 (1999).

17

1-09-0879

Similarly to *Peeples*, the only justification defendant can offer to support a "special circumstance" is the fact that he is African-American and the victims were white. *Peeples*, 155 Ill. 2d at 460, 616 N.E.2d at 311, citing *People v. Diaz*, 123 Ill. App. 3d 239, 242-43, 462 N.E.2d 770, 772-73 (1984). Nonetheless, where there were no racial overtones in the basic facts of the case, we perceive no abuse of discretion in refusing to pose the supplemental *voir dire* questions to the panel. See *People v. Fort*, 248 Ill. App. 3d 301, 312, 618 N.E.2d 445, 454 (1993) (rejecting defendant's contention that the trial court abused its discretion in refusing to ask "whether the jurors thought that blacks were more likely than whites to commit crimes and whether the jurors had any racial animosities"). Here, as in *Peeples*, the trial judge asked each prospective juror whether sympathy, bias, or prejudice would affect his or her judgment. *Peeples*, 155 Ill. 2d at 460, 616 N.E.2d at 311. Thus, "defendant was given sufficient opportunity to discover any bias or prejudice held by jurors." *Peeples*, 155 Ill. 2d at 460, 616 N.E.2d at 311, citing *People v. Bunch*, 159 Ill. App. 3d 494, 510, 512 N.E.2d 748, 759 (1987). Consequently, there was no error in the trial court's ruling and further examination of the application of the plain-error doctrine is not warranted.

We next consider defendant's argument that the trial judge violated Supreme Court Rule 431(b) (Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007), by failing to adhere to its dictates regarding questioning potential jurors on the concepts commonly referred to as the *Zehr* principles. See *People v. Zehr*, 103 Ill. 2d 472, 469 N.E.2d 1062 (1984). The State counters that defendant forfeited the issue by failing to object at trial or in his posttrial motion and, regardless of forfeiture, the trial judge substantially complied with the rule.

18

1-09-0879

Outside the presence of the venire, after addressing the questions proposed by defendant, the trial judge stated:

"And again, I would ask that you remind me when you [*sic*] are doing this. Once I get on a roll, I may forget something. All right. Are we ready then?"

With that, *voir dire* commenced. Included in the judge's prefatory comments were many of the principles embodied by Rule 431(b), including the presumption of innocence, the burden of proof imposed on the State throughout, and that defendant is not required to prove his own innocence or present evidence on his own behalf. Additionally, the jurors were encouraged to be "frank and open" in their answers to the questions, as "That is the way to ensure fairness to both sides."

The questioning of each potential juror followed an almost identical pattern, except where follow-up questions were required. The opening questions were based upon the responses articulated by jurors on their jury summons. The prospective jurors were asked if they had any physical limitation that would impact their ability to serve. Their involvement in "clubs, social organizations or church groups" was also explored. Each person was likewise asked if they harbored any bias or prejudice against persons accused of crimes or if the type of case before them would prevent them from being fair or impartial. Additional inquiry focused on whether there were any reasons why they could not be fair and impartial to both sides and keep an open mind throughout the trial.

The trial judge then asked:

"Do you understand that the defendant is presumed innocent and does not have to offer any evidence but must be proven guilty beyond a reasonable doubt by

19

the State?"

The jurors were also asked whether they would judge a police officer's testimony the same way they judged the testimony of any other type of witness. The final three questions concerned the prospective jurors' ability to sign the appropriate verdict form, whether the State proved defendant guilty beyond a reasonable doubt or failed to do so, and whether they would follow the law as instructed by the trial judge.

Supreme Court Rule 431(b) provides:

"(b) The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Official Reports Advance Sheet No. 8 (April 11, 2007), R. 431(b), eff. May 1, 2007.

As this claim of error concerns the interpretation of a supreme court rule, our review is *de novo*. *People v. Suarez*, 224 Ill. 2d 37, 41-42, 862 N.E.2d 977, 979 (2007). Once again, we note the rules promulgated by our supreme court carry with them the force of law; they are not

aspirational and are intended to be adhered to as written. See *Bright v. Dicke*, 166 Ill. 2d 204, 210, 652 N.E.2d 275, 277-78 (1995). Our initial task, then, is to determine whether any error actually occurred during jury selection. See *Lewis*, 234 Ill. 2d at 43, 912 N.E.2d at 1227. As this claim of error centers upon the interpretation of a supreme court rule, we are guided by the same principles we utilize in construing statutes. *People v. Santiago*, 236 Ill. 2d 417, 428, 925 N.E.2d 1122, 1128 (2010). The ultimate goal of this undertaking is to determine the intent of the drafters and give effect to that intent. *Santiago*, 236 Ill. 2d at 428, 925 N.E.2d at 1128. Our first step in the process involves applying the plain and ordinary meanings to the words used in the enactment. *Santiago*, 236 Ill. 2d at 428, 925 N.E.2d at 1128. In those situations where the language is clear and unambiguous, we must apply the rule as written, without utilizing any additional aids for construing it. *Santiago*, 236 Ill. 2d at 428, 925 N.E.2d at 1128.

As a threshold matter, we are aware that our supreme court recently concluded the language of Rule 431(b) is, in fact, "clear and unambiguous." *People v. Thompson*, No. 109033, slip op. at 6 (October 21, 2010). Further, the court in *Thompson*, concluded:

> "Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she understands and accepts each of the principles in the rule. The questioning may be performed either individually or in a group, but the rule requires an opportunity for a response from each prospective juror on his understanding and acceptance of those principles." *Thompson*, slip op. at 6.

Judging the proceedings below against this backdrop, it is readily apparent that the trial

court erred. Clearly, the judge failed to ascertain whether the potential jurors understood and accepted each of the four *Zehr* principles. Additionally, the court entirely omitted the fourth principle. What the court employed was a collapsing of the first three principles. Manifestly, our supreme court's ruling in *Thompson* makes clear this inquiry was insufficient to satisfy the dictates of Rule 431(b).

Defendant's contention that forfeiture is inapplicable in the present case is unavailing in light of *Thompson*. In *Thompson*, the supreme court rejected the defendant's argument for relaxing forfeiture. In doing, the court observed that there was nothing in the record to indicate the trial court was not amenable to an objection based upon Rule 431. *Thompson*, slip op. at 11. The supreme court entertained a presumption the trial court would have followed the dictates of Rule 431(b), if the matter was brought to its attention. The court concluded: "A simple objection would have allowed the trial court to correct the error during *voir dire.* Accordingly, we conclude there is no compelling reason to relax the forfeiture rule in this case." *Thompson*, slip op. at 11.

The *Thompson* court's rationale clearly resonates in the case *sub judice.* The record reveals that the court below employed a highly cooperative and transparent approach to *voir dire.* Moreover, the parties were encouraged to remind the trial judge of any omissions during the process. Thus, the record below offers no basis to relax the forfeiture rules. As in *Thompson*, we are persuaded the trial judge would have been receptive to an objection on the basis of Rule 431(b), had one been interposed, regardless of whether it came from defendant or the State.

Defendant's claim is premised solely on the first prong of plain error, that "a clear or

obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Piatkowski*, 225 Ill. 2d at 565, 870 N.E.2d at 411. As noted, the trial court's error in this case was clear. Given the nature of the verdicts – that defendant was acquitted of the murder of Clara Daniels and the attempted murder of Steven Tischer – along with the course of the deliberations, defendant contends that the evidence was closely balanced and that the error during *voir dire* threatened to tip the scales against him. Defendant frames his position as follows:

> "The jury was especially concerned about the credibility of Torres, as expressed by the note it sent the judge. *** The jury was so unsure of [defendant's] guilt it had to be sent home and called back for more deliberations the following morning. *** The fact that the jury did not hear from Johnson could have been the deciding factor of guilt in the juror's [*sic*] minds. Under these circumstances, the court's failure to ensure that the jurors would not hold it against Johnson if he did not testify was a critical error."

We find defendant's logic and conclusion to be of rather dubious merit. During deliberations the jury sent a note to the judge. The trial judge received the note at approximately 9:50 p.m. The record does not make clear when the jury commenced deliberations; that appears to have occurred during the early evening hours, when the jurors' dinner was to arrive. The trial judge shared the note with the parties:

> "We cannot reach a consensus on the first two counts of home invasion. What is the next step?

The issue we cannot decide on [*sic*] [defendant] being placed at the scene solely on Jose Torres's testimony. Nobody else positively I.D.'d him."

The trial judge brought the jury into the court room. The jurors were advised that they had received the evidence, including those exhibits sent into the jury room, and that they should continue their deliberations. The judge then asked the foreperson if they were close to reaching a verdict. Upon learning they were not, the court advised the jurors to continue deliberating. At 11:43 p.m., the jurors were excused for the evening. They returned the following morning and resumed deliberations, at approximately 10:10 a.m. At 11:40 a.m., the jury returned its verdicts, following approximately 7 to 10 hours of total deliberations.

Based upon this series of events, defendant speculates that defendant's failure to testify "could have been the deciding factor." We decline defendant's invitation to conclude the evidence was closely balanced based upon rote speculation about the course of deliberations or the note from the jury. Our review of the evidence persuades that it was not closely balanced, notwithstanding the jury's misgivings about Torres' testimony were during the first few hours of deliberations. Moreover, we cannot conclude the trial judge's failure to ascertain the jurors' understanding and acceptance that defendant need not testify was as momentous as defendant now claims.

The note from the jury simply reflected an impasse on the issue of placing defendant on the scene, as articulated by his codefendant. Had defendant taken the stand, we lack the omniscience to predict whether he would have offered any persuasive testimony to aid the jury in this pursuit. Moreover, we cannot identify what occurred in the minds of the individual jurors

24

that led them ultimately to reach a consensus. Nonetheless, our review of the record supports the conclusion that there was sufficient circumstantial evidence to link defendant to the crimes charged and to support his conviction. Curiously, while defendant claims the evidence was closely balanced, he offers no challenge to its sufficiency. Because the evidence against defendant was not, in our view, closely balanced, we must honor the procedural default. *Naylor*, 229 Ill. 2d at 593, 893 N.E.2d at 659-60.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

FITZGERALD SMITH, P.J., with JOSEPH GORDON, J., concur.

REPORTER OF DECISIONS – ILLINOIS APPELLATE COURT
(Front Sheet to be Attached to Each Case)

| Please Use Following Form: | |
|---|---|
| Complete TITLE of Case | THE PEOPLE OF THE STATE OF ILLINOIS, <br><br>               Plaintiff-Appellee, <br><br> v. <br><br> WILLIAM JOHNSON, <br><br>               Defendant-Appellant. |
| Docket No. <br><br> COURT <br><br><br> Opinion Filed | No. 1-09-0879 <br> Appellate Court of Illinois <br> First District, FIFTH Division <br><br> November 24, 2010 <br> (Give month, day and year) |
| JUSTICES | JUSTICE TOOMIN delivered the opinion of the court: <br><br> FITZGERALD SMITH, P.J., with JOSEPH GORDON, J.     concur [s] <br><br>                                                    dissent[s] |
| APPEAL from the Circuit Ct. of Cook County, Chancery Div. | Lower Court and Trial Judge(s) in form indicated in the margin: <br><br> The Honorable    Kerry Kennedy,  Judge Presiding. |
| For APPELLANTS, John Doe, of Chicago. <br><br> For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel) <br><br> Also add attorneys for third-party appellants or appellees. | Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented. <br><br> Attorneys for Plaintiff-Appellee-People of the State of Illinois:   Anita Alvarez <br>                                                State's Attorney <br>                                              County of Cook <br>                                              Room 309-Richard J. Daley Center, <br>                                              Chicago, IL 60602 <br><br>     Of counsel: Alan Spellberg, Peter Fischer, Sheilah O'Grady <br><br> Attorneys for Defendant-Appellant:                  MICHAEL J. PELLETIER <br>                                              State Appellate Defender <br><br>                                            PATRICIA UNSINN <br>                                            Deputy Defender <br>                                            STEPHANIE FISHER <br>                                            Assistant Appellate Defender |

Office of the State Appellate Defender
203 North LaSalle Street - 24th Floor
Chicago, IL 60601
312/814-5472